**Jack EDMONDS, et al., on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**Alan LEVINE, in his official capacity as secretary, Agency for Health Care Administration of the State of Florida, Defendant.**

**No. 05–21215–CIV.**

United States District Court, S.D. Florida.

Feb. 14, 2006.

Miriam Harmatz, Florida Legal Services, Inc., Miami.

C. Shawn Bochringer, Legal Aid Service of Broward County, Inc., Plantation.

Neil Kodsi, Carlton Fields, P.A., Miami.

Jennifer Wimberly, Legal Aid Society of Orange County Bar, Orlando.

Jane Perkins, National Health Law Program, Chapel Hill, N.C.

*ORDER GRANTING PLAINTIFFS' MO-*
*TION FOR SUMMARY JUDG-*
*MENT, ENTERING PERMANENT*
*INJUNCTION, AND DENYING AS*
*MOOT PLAINTIFFS' AMENDED*
*MOTION FOR PRELIMINARY IN-*
*JUNCTION*

THEODORE KLEIN, United States Magistrate Judge.

THIS MATTER came before the Court on Plaintiffs' Motion for Summary Judgment (D.E. No. 92) filed on September 16, 2005, and related filings. Before the summary judgment motion had been fully briefed by the parties, the Court held a hearing on September 21–23, 2005, on Plaintiffs' Amended Motion for Preliminary Injunction (D.E. No. 11) and related filings, at which time the Court heard live testimony from several witnesses and oral argument from counsel on the preliminary injunction issue. After careful consideration of all materials submitted in connection with both the preliminary injunction and summary judgment motions, the Court concludes that this case turns on an issue of statutory construction and that there are no material facts in dispute. Accordingly, the Court is able to rule directly on Plaintiffs' summary judgment motion which, for the reasons discussed below, is GRANTED. The Court enters a PERMANENT INJUNCTION directing Defendant to stop applying the Neurontin policy announced in "Medicaid Changes Effective July 1, 2004, Neurontin Label Indications and Dosing," provide coverage for off-label uses of Neurontin which are cited in one of the congressionally-approved compendia listed in 42 U.S.C. § 1396r–8(g)(1)(B)(i), as discussed herein; and take other steps necessary to ensure that notice of this change in policy is communicated to affected individuals. The Court DENIES AS MOOT Plaintiffs' amended motion for preliminary injunction.[1]

## BACKGROUND

### Present Dispute

Plaintiffs Jack Edmonds, Susan Weschke, and Gaylord Payne (collectively referred to herein as "Plaintiffs") are Medicaid recipients who are challenging a policy of the Florida Agency for Health Care Administration ("AHCA")[2] to deny reimbursement under the federal Medicaid program for prescriptions for the drug Neurontin and/or its generic equivalent, Gabapentin (collectively referred to herein as "Neurontin"), except when prescribed for four indications or uses: adjunctive therapy for partial seizures (including partial seizure refractory); postherpetic neuralgia; diabetic neuropathy; and amyotrophic lateral sclerosis ("ALS"). AHCA's policy on Neurontin, which was announced in "Medicaid Changes Effective July 1st, 2004, Neurontin Label Indications and Dosing," took effect on July 1, 2004 (the "Neurontin policy"). *See* Plfs' Not. of Filing Exs. ("Plfs' Not.") (D.E. No. 9), Ex. 5–4.

Plaintiffs suffer from neuropathic pain resulting from conditions other than the four identified above. Plaintiffs and their treating physicians or psychiatrists claim that Neurontin is one of the first-line medications for neuropathic pain, is a relatively safe and inexpensive drug widely used to treat nerve-related pain and some psychiatric disorders, and is medically necessary for the treatment of their conditions. Pri-

---

**1.** The Court has granted Plaintiffs' Amended Motion for Class Certification by separate Order.

**2.** Defendant Alan Levine ("Defendant") is being sued in his official capacity as Secretary of AHCA. The Court will use the terms "AHCA" and "Defendant" interchangeably in this Order, unless differentiation is required.

or to July 1, 2004, Plaintiffs' prescriptions for Neurontin were covered under Medicaid by AHCA. Since July 1, 2004, however, their requests for Neurontin coverage have been, and will continue to be, denied as a result of AHCA's new policy, if the drug is not being prescribed for one of the four approved uses cited above. Plaintiffs claim that AHCA's Neurontin policy violates the federal Medicaid Act because it fails to provide them with coverage of prescriptions for Neurontin for medically accepted indications as required by the Medicaid Act.

Plaintiffs seek a permanent injunction directing Defendant Alan Levine, in his official capacity as Secretary of AHCA ("Defendant"), to: (1) refrain from continuing to implement the policy announced in "Medicaid Changes Effective July 1st, 2004, Neurontin Label Indications and Dosing;" (2) adopt a written policy that ensures that a prescription for the covered outpatient drug Neurontin/Gabapentin will be reimbursed by Defendant if the drug use is cited in either the drug labeling or in at least one of the drug compendia cited at 42 U.S.C. § 1396r–8(g)(1)(B)(i); (3) publish notice to all physicians and pharmacists that their patients can resubmit a prescription for Neurontin/Gabapentin, along with an amended prior authorization form; and (4) provide written notice to members of the class whose prescriptions were denied since July 2004 that they can submit new prescriptions and prior authorization requests.

### Statutory Framework

■ The Medicaid program is a cooperative federal-state program designed to assist states with the cost of providing health care to the poor. *See* 42 U.S.C. §§ 1396–1396v; *see also Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990); *Pharm. Research & Mfrs. of Am. v. Meadows,* 304 F.3d 1197, 1199–1200 (11th Cir.2002). States are not required to participate in the program; however, if a state chooses to do so, it must comply with federal statutory and regulatory requirements. *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dept. of Health & Rehab. Servs.,* 225 F.3d 1208, 1211 (11th Cir.2000). Actual Medicaid relief is administered through state agencies pursuant to a Medicaid plan that has been approved by the U.S. Department of Health and Human Services ("HHS"). *Meadows,* 304 F.3d at 1199–1200. AHCA is the state agency that administers the Medicaid program in Florida. Fla. Stat. §§ 409.901(14), 409.902 (2004).

■ The Medicaid Act requires participating states to make certain mandatory services available to all individuals who are covered by the state's Medicaid plan. *See* 42 U.S.C. § 1396a(a)(10). States may also provide other, optional medical services such as coverage for outpatient prescription drugs. *Id.; see also* 42 U.S.C. § 1396d(a)(12). Once "a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law." *Doe v. Chiles,* 136 F.3d 709, 714 (11th Cir.1998).

### Coverage of Outpatient Prescription Drugs

The Medicaid Act's provisions for coverage of outpatient prescription drugs (also referred to herein as "Medicaid-eligible drugs") are set forth in 42 U.S.C. § 1396r–8. The Act provides coverage for the "medically accepted indication" of "any covered outpatient drug."[3] The term

---

**3.** A "covered outpatient drug" is a drug which may be dispensed only upon prescription and which is approved for safety and effectiveness as a prescription drug under the federal Food, Drug, and Cosmetic Act. § 1396r–8(k)(2)(A). The parties agree that Neurontin is a covered outpatient drug.

"medically accepted indication" is defined as

> any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 301 *et seq.*], or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection (g)(1)(B)(i) of this section.

§ 1396r–8(k)(6). There are three compendia listed in subsection (g)(1)(B)(i): United States Pharmacopeia–Drug Information ("USP"), American Hospital Formulary Service Drug Information ("AHFS"), and DRUGDEX Information System ("DRUG-DEX"). Thus, the Medicaid Act directs states to reimburse any use for a covered outpatient drug which is either (1) approved by the Federal Drug and Food Administration ("FDA") or (2) supported by one or more citations in any congressionally-recognized compendia.[4]

The FDA has approved Neurontin, a covered outpatient prescription drug, for two uses: adjunctive therapy for partial seizures and postherpetic neuralgia. There are many off-label uses for Neurontin, all of which thus call into play the question of whether such uses are "supported by one or more citations included ... in any of the compendia." Florida covers the two FDA-approved uses, and two other off-label uses of Neurontin, adopting its own criteria for deciding that those are the only two such uses which are properly supported by citation in the compendia. It is the meaning of the phrase "supported by one or more citations included ... in any of the compendia" upon which this case turns.

## States' Ability to Restrict or Exclude Coverage

While the Medicaid Act requires a state paying for outpatient prescription drugs to reimburse for "medically accepted indications," the Act does permit states to limit coverage under certain circumstances. *See* § 1396r–8(d). Under § 1396r–8(d)(1)(B), a state may *exclude* a drug from coverage, that is, *deny* reimbursement, under four circumstances: if the prescribed use is not for a medically accepted indication (i.e., either FDA approved or supported by citation in a compendium); if the drug is listed in § 1396r–8(d)(2) or is subsequently determined by the Secretary of HHS by regulation to be subject to clinical abuse or inappropriate use; if the drug is subject to restriction pursuant to an agreement between the state and drug manufacturer; or if the drug has been excluded by a state-established formulary.

The only one of the four circumstances listed above which is at issue here is whether the disputed uses are for medically accepted indications. The parties agree that the other three of these circumstances *do not exist here*. Neurontin is not on the list of restricted drugs delineated in § 1396r–8(d)(2) nor has it been restricted by HHS regulation; there is no agreement between Neurontin's manufacturer and the State of Florida to restrict coverage; and Florida has not established a drug formulary. Two of the circumstances above, i.e., appearance on a restricted drug list or drugs subject to a coverage restriction agreement, require only limited comment and will be adverted to later. The third, the drug formulary, requires further elucidation.

---

**4.** Non–FDA approved uses are those which are being used in a manner not approved by the FDA for marketing. They are referred to as "off-label" uses. These are legally permissible uses, and are commonly prescribed by doctors for their patients.

A drug formulary, which is developed by a committee of physicians, pharmacists, and other appropriate individuals or the state's drug use review board, is a list of Medicaid-eligible drugs for which the state will provide reimbursement when prescribed for medically accepted indications. §§ 1396r–8(d)(4)(A)–(B). The Medicaid Act permits a state (through its formulary committee) to remove a Medicaid-eligible drug from the formulary, with the result that the drug will no longer be covered for reimbursement, if the drug that "does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome" over other drugs included in the formulary. § 1396r–8(d)(4)(C). The committee's decision to exclude a drug from the formulary is generally limited to issues of clinical safety and effectiveness. *Id.; see Meadows,* 304 F.3d at 1202. The committee must provide a written explanation, available to the public, of the basis for excluding a drug from the formulary. § 1396r–8(d)(4)(C). As the *Meadows* court explained, the exclusion of a drug from a state formulary "has the effect of actually denying coverage of, or payment for, certain Medicaid-eligible drugs." 304 F.3d at 1207.

Next, an explanation of prior authorization programs is in order. There are two types of such programs authorized by the Medicaid Act: one pursuant to a formulary, which operates differently than the other type authorized by the Act. The formulary type will be discussed first.

Because through the formulary process a state can exclude from coverage drugs that otherwise would be eligible for reimbursement under the Medicaid Act, Congress has devised a process whereby a doctor who wishes to prescribe an excluded drug may seek an exception to the exclusion (and thus obtain reimbursement for that drug). The Medicaid Act requires a state, when it establishes a formulary, to also establish a prior authorization program that is consistent with § 1396r–8(d)(5). § 1396r–8(d)(4)(D). Subsection (d)(5) provides that a state may require, "as a condition of coverage or payment for a covered outpatient drug," prior authorization, or approval, of the drug before it is dispensed. The only two statutory requirements for a prior authorization program are that the state must respond to the prescribing doctor within 24 hours of his request for prior authorization, and a 72–hour supply of the drug must be made available in an emergency situation, §§ 1396r–8(d)(5)(A)–(B); *see also Meadows,* 304 F.3d at 1201.

"Because the statutory requirements of [ ] a formulary also mandate a prior authorization program, ... we construe this requirement to mean that a state must *consider* coverage for an excluded drug on a case-by-case basis." *Meadows,* 304 F.3d at 1207–1208 (citation omitted; emphasis in original). This means that under a *formulary* prior authorization program, a doctor who is prescribing a drug that has been excluded from the formulary can contact the state, convey medical information specific to the patient, and perhaps obtain an *exception* to the exclusion for the requested drug. *Id.* at 1208 n. 9. Ultimately, though, the state retains the final authority over coverage of non-formulary drugs. *Id.*

As previously noted, Florida has not established a drug formulary and necessarily, therefore, it could not and has not established the particular type of prior authorization program contemplated by that part of the statute. *Id.* at 1207–1208. Rather, Florida has established the other type of prior authorization program contemplated by the Medicaid Act. *Id.* (concluding that Florida created a "prior authorization program" within the meaning

of §§ 1396r–8(d)(1)(A), (d)(5)). Congress has authorized two very distinct prior authorization programs; the one discussed above which is created in conjunction with a drug formulary which permits the state to have final authority to exclude a drug, and the one like Florida's which covers all Medicaid-eligible drugs and conditions payment for any such drug upon a doctor contacting the state before the drug is dispensed. Congress was careful to differentiate between the two: "A prior authorization program established by a State under paragraph (5) *is not a formulary* subject to the requirements of this paragraph." § 1396r–8(d)(4) (emphasis supplied); *see also Meadows,* 304 F.3d at 1201 (emphasis in original).

As previously mentioned, the only requirements for any prior authorization program are those outlined above, i.e., the 24–hour response and the 72–hour emergency drug supply. § 1396r–8(d)(5); *see also Meadows,* 304 F.3d at 1201. Under Florida's program, when a doctor who wishes to prescribe a drug that is subject to the prior authorization program contacts the state pharmacist, that individual advises the doctor of the availability of other drugs that allegedly have comparable therapeutic value but are less expensive. *Id.* at 1198. "[A]pproval of the prescribing doctor's first-choice drug is guaranteed in 100 percent of all cases, provided only that he or she make the telephone call." *Id.* This type of prior authorization program produces substantial cost savings for organizations purchasing large volumes of drugs. *Id.* ("During the first three months of the program, approximately 55 percent of all [the calls from prescribing doctor to state pharmacist] have resulted in a change of the prescription to a drug on the preferred drug list."); *see also Walsh,* 123 S.Ct. at 1868 (citing *Meadows*). Under the prior authorization program established by the State of Florida, the state

may try to persuade a doctor to use an alternative drug, but ultimately the doctor retains the final word on use of the drug.

The Medicaid Act does not authorize a state to use the second type of prior authorization program to *deny* coverage for a covered drug; it can only *condition* reimbursement upon a prescribing doctor first calling a state pharmacist to obtain approval for the drug. *Id.* at 1201, 1207. *See also* Plfs.' Second Not. of Filing Exs. ("Plfs.' Second Not.") (D.E. No. 44), Ex. 2 (Medicaid Drug Rebate Program Release No. 70, "DRUGDEX Approved as a New Compendium," Note to All State Medicaid Directors from Sally K. Richardson, Dir. Of HHS' Center for Medicaid and State Ops (1997)) at 1 ("prior approval policies can be put in place, . . . but prior authorization cannot be used to simply deny the off-label DRUGDEX-identified indication for a drug."). Under this second type of prior authorization program, the prescribing doctor retains the authority to override any suggestions made by the state pharmacist. *Meadows,* 304 F.3d at 1208 n. 9 (distinguishing this second type of prior authorization program from a formulary prior authorization program, where the state retains the final authority over coverage of non-formulary drugs).

The *Meadows* court discussed the different purposes likely served by these two types of prior authorization programs.

Since a federal formulary *excludes* from coverage Medicaid-eligible outpatient drugs, *see* subsection (d)(1)(B)(iv), the prior authorization provision specified by subsection (d)(4)(D) permits the prescribing doctor to obtain an exception to this exclusion, presumably because of medical factors specific to his or her patient. In contrast, a prior authorization program under subsections (d)(1)(A), (d)(5), such as that provided in the Florida law, can be used to inform doctors about the availability of drugs

with comparable therapeutic properties that are also more cost-effective for the state. Presumably, some doctors will learn to avoid the prior authorization program by routinely looking for a suitable drug on the "preferred drug list," Fla. Stat. § 409.91195(4); hence, the shifts in market share following the enactment of the Florida law.

*Id.* at 1208 n. 9.

A major difference between the two types of programs relates to who retains the final authority with regard to coverage of a Medicaid-eligible drug. Under the type of program that exists in Florida, i.e., one established pursuant to §§ 1396r–8(d)(1)(A), (d)(5), the state can require a prescribing doctor to seek approval of a particular drug as a condition of Medicaid coverage. Ultimately, though, the *doctor* retains the authority to override any suggestions made by the AHCA state pharmacist and obtain approval of, and eventual reimbursement for, the doctor's first-choice drug. However, under the formulary prior authorization program, a prescribing doctor may ask the state to cover a Medicaid-eligible drug that has been excluded from the formulary, but ultimately, the state can deny the request for coverage, meaning it is the *state* which retains the final authority over coverage for non-formulary drugs.

As noted earlier, the other methods by which a state may restrict coverage of Medicaid-eligible drugs deserve brief mention. The Medicaid Act permits a state to exclude or otherwise restrict coverage for drugs that are listed in § 1396r–8(d)(2). § 1396r–8(d)(1)(B)(ii). Subparagraph (d)(2) is a list of drugs or classes of drugs that Congress has determined may be excluded from coverage or otherwise restricted. The Secretary of HHS must by regulation periodically update this list of drugs or their medical uses "which the Secretary has determined, based on data collected by surveillance and utilization review programs of State medical assistance programs, to be subject to clinical abuse or inappropriate use." § 1396r–8(d)(3). Through a drug utilization review program, a state may advise the Secretary of drugs that are subject to gross overuse or inappropriate or medically unnecessary care.[5] Until the Secretary amends the list of excluded drugs to include a particular drug, however, the state may not exclude that drug from coverage except through its formulary committee based solely on clinical factors. The other method of exclusion, where an agreement between the drug's manufacturer and the state to restrict coverage exists, is not applicable.

The statutory scheme is carefully constructed in such a way to precisely circum-

---

**5.** States are required to implement drug use review programs in order to assure that prescriptions are appropriate, medically necessary, and not likely to result in adverse medical results. § 1396r–8(g)(1). These drug use review programs "assess data on drug use against predetermined standards, consistent with" the drug compendia listed in § 1396r–8(g)(1)(B)(i) and peer-reviewed medical literature. § 1396r–8(g)(1)(B). These programs must (a) prospectively review drug therapy before prescriptions are filled or delivered to Medicaid recipients, and (b) retrospectively "identify patterns of fraud, abuse, gross overuse, or inappropriate or medically unnecessary care, among physicians, pharmacists and

[Medicaid recipients], or associated with specific drugs ...." §§ 1396r–8(g)(2)(A) & (B). Then, on an annual basis, each state must submit a report to the HHS Secretary which includes, among other things, a description of the nature and scope of the prospective and retrospective drug use review programs. § 1396r–8(g)(3)(D). Thus, this provision establishes a scheme whereby states can identify drugs that are subject to gross overuse or inappropriate or medically unnecessary care, then formally present that information to the Secretary, who must periodically update the list of restricted drugs after determining, based on this information, which drugs are subject to clinical abuse or inappropriate use.

scribe the only methods by which a state may remove a Medicaid-eligible drug from coverage and prevent it from either arbitrarily removing a drug or adopting its own *ad hoc* procedure for removing a drug from coverage.

### Legislative and Agency Actions

In the spring of 2004, following news reports that Neurontin was being widely prescribed for off-label uses and that reimbursement for the drug by state Medicaid programs was significant, the Florida Legislature passed legislation authorizing AHCA, at its discretion, to require prior authorization for the off-label uses of Medicaid-covered prescribed drugs, including Neurontin. Specifically, the legislation provided that AHCA

> may require prior authorization for the off-label use of Medicaid-covered prescribed drugs as specified in the General Appropriations Act. [AHCA] may, but is not required to, preauthorize the use of a product for an indication not in the approved labeling. Prior authorization may require the prescribing professional to provide information about the rationale and supporting medical evidence for the off-label use of a drug.

Fla. Stat. § 409.912(39)(a) 14. (2004).[6] Through the General Appropriations Act, the Legislature reduced the funds available for prescription drug reimbursements for Florida Medicaid recipients, including the money available for Neurontin:

> Funds in Specific Appropriations 216 reflect a reduction of $2,930.841 from the General Revenue Fund and $4,200,159 from the Medical Care Trust Fund as a result of implementing a prior authorization program for the off-label use of Neurontin.

*See* Plfs.' Not., Ex. 7 at 2.

AHCA responded to this legislation by changing its policy on Neurontin reimbursements for Medicaid recipients, effective July 1, 2004. Prior to July 1, 2004, AHCA reimbursed *all* Neurontin prescriptions. Under the new policy, AHCA decided to cover Neurontin for the two FDA-approved uses, and for off-label uses only when the uses for which the drug was prescribed were substantiated as being safe and effective by double-blind, placebo-controlled, randomized clinical trials. For those uses which are listed in the drug compendia but which AHCA has found are not supported by the criteria decided upon it as being sufficiently sound, AHCA denies coverage. Thus, in accordance with this new policy, AHCA only covers Neurontin when it is prescribed for one of the following four uses: (a) the two FDA-approved uses for this drug (adjunctive therapy in treating partial seizures, including partial seizure refractory,[7] and postherpatic neuralgia in adults), and (b) the two off-label uses which Defendant has determined merit coverage (ALS and diabetic peripheral neuropathy).[8] The new

---

6. In 2005, the Florida Legislature amended § 409.912(39)(a), modifying subparagraph 14, and renumbering it as subparagraph 13. *See* 2005 Fla. Laws, ch. 2005–60, § 16 (effective July 1, 2005).

7. Although, according to DRUGDEX, Neurontin is not FDA-approved for "partial seizures—refractory," AHCA covers the drug for this use. It appears that "partial seizures—refractory" has been subsumed by AHCA as being within "partial seizures—adjunctive therapy," a use for which Neurontin *is* FDA-approved.

8. According to AHCA, it reimburses for ALS because the FDA has granted Neurontin "Orphan Drug Status" for this indication even though it is not supported by double-blind, placebo-controlled, randomized clinical trials, and its use for this purpose is rated as "ineffective" in DRUGDEX. The FDA grants orphan drug designation for treatments that might provide significant benefit to patients with serious, life-threatening diseases that affect less than 200,000 persons in the United States. AHCA reimburses for diabetic peripheral neuropathy because it found there were

Neurontin policy was summarized in a document entitled "Medicaid Changes Effective July 1st, 2004, Neurontin Label Indications and Dosing." *Id.*, Ex. 5 at 5–4. *See also id.* at 5–1 ("Florida Medicaid, Effective July 1, 2004"); *id.* at 5–2 ("Florida Medicaid, Neurontin Off Label and Dosing Issues").

In addition, AHCA published a new Prior Authorization form for Neurontin which allows a provider to request pre-authorization for a Neurontin prescription by completing the form and indicating that the drug is being prescribed for one of the four approved uses mentioned above. *Id.* at 5–5 ("Florida Medicaid, Prior Authorization, Neurontin"). Under the new Neurontin policy, if a provider submits a Prior Authorization form and indicates that Neurontin is being prescribed for something other than one of the four approved conditions, AHCA denies reimbursement.

On March 18, 2005, AHCA published a proposed rule in which it incorporated by reference its revised Florida Medicaid Prescribed Drug Services, Coverage, Limitations and Reimbursement Handbook, December 2004. *Id.*, Ex. 8 at 1 (Fla. Admin. Weekly Vol. 31, No. 11 (March 18, 2005) at 1073 (setting forth proposed Fla. Admin. Code R. 59G–4.250)). The revised Handbook, which purports to reflect recent legislative changes, contains a section under "Service Limitations" entitled "Approval Criteria" which advises Medicaid providers that approval criteria for each drug is

> based upon FDA approved indications, precautions and warnings. When there is evidence-based use for a medication that includes controlled, comparative

clinical trials, [AHCA] may choose to add this use to the approved indications. These criteria are subject to change based upon new FDA approved indications or multiple, randomized, well controlled, clinical trials that demonstrate new, safe and effective uses for a medication.

*Id.* at 2.

### Plaintiffs

Each of the named Plaintiffs is a Medicaid recipient whose doctor prescribed Neurontin for one of the off-label uses listed in DRUGDEX that is no longer covered by AHCA, and whose request for reimbursement was therefore denied by AHCA. By separate Order issued today, the Court has certified a class of Florida Medicaid recipients whose doctors also prescribed Neurontin for one of the off-label uses that is no longer covered by AHCA, and whose requests for coverage have been or will be denied by AHCA.[9] None of the Medicaid recipients whose requests were denied have been successful in obtaining a reversal of the decision to deny coverage. AHCA has agreed to continue to cover Neurontin for persons whose reimbursement requests were denied, upon notice to the agency, until this dispute is resolved.

### Drug Compendia

Some background information on the drug compendia is useful here. Of the three drug compendia listed in § 1396r–8(g)(1)(B)(i), DRUGDEX and AHFS are the most up-to-date and the parties have focused their attention on them.[10] None of the compendia has a section entitled "Uses Supported by Citation" (i.e., tracking the

---

multiple, randomized controlled trials demonstrating that Neurontin was safe and effective when used for this indication.

**9.** The parties agree that between July 1, 2004, and September 2005, AHCA denied approximately 6,000 requests from doctors for prior

authorization for Neurontin because the patients' clinical diagnoses were not one of the four approved by AHCA.

**10.** The third drug compendium, USPD, and DRUGDEX are published by the same parent company.

language of the statute), and each is arranged differently.

In AHFS, medically accepted indications are listed in a section entitled "Uses." *See* Plfs.' Not. of Filing Exs. in Supp. of Mot. Summ. J. ("Plfs.' SJ Not.") (D.E. No. 95), Ex. 4. AHFS lists the two FDA-approved uses as well as *several off-label uses for* Neurontin.[11] AHFS discusses the effectiveness of Neurontin for the listed uses but does not mention documentation nor refer to the literature that the AHFS editors reviewed in preparing the compendium.

DRUGDEX is more complex. The following sections in the DRUGDEX chapter on Neurontin are relevant in this lawsuit. Section 4.5, entitled "Therapeutic Uses," lists 54 uses for Neurontin including both the two FDA-approved and 52 off-label uses. For each of the 54 uses, DRUGDEX includes an overview which reflects whether the FDA has approved Neurontin for that particular use, and a rating of the efficacy ("effective," "possibly effective," and "ineffective")[12] and documentation of Neurontin ("excellent," "good," "fair," and "poor") for that use. DRUGDEX also includes a summary of the support for each use. Support ranges from a single case study for some of the uses to randomized placebo-controlled double-blind clinical studies for other uses. Section 6.0 is entitled "References" and contains citations to 178 articles reviewed by the editors of DRUGDEX. Some of the articles address uses for Neurontin that are not listed in the "Therapeutic Uses" section. Section 4.3 is entitled "Place in Therapy" and references one of the two FDA-approved uses

for Neurontin. Finally, Section 4.6 is entitled "Comparative Efficacy and Evaluation with Other Similar Therapeutic Agents" and compares the efficacy of Neurontin with other drugs in treating a few conditions, including diabetic peripheral neuropathy.

## ANALYSIS

### Issue in Dispute

The pertinent facts in this case are not in dispute. Defendant claims there are numerous disputed material facts which preclude summary judgment, but the fact is, this is in reality a case of statutory construction. The case turns on the meaning of the phrase "the use of which is supported by one or more citations included or approved for inclusion in any of the compendia" as contained in the definition of the term "medically accepted indication" in § 1396r–8(k)(6).

### Standard of Review

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the initial responsibility of informing the Court of the basis for its motion and of identifying those materials which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party.

---

**11.** The off-label uses listed in AHFS are diabetic neuropathy and chronic neurogenic pain in a variety of conditions including trigeminal neuraliga, pain and control of paroxysmal symptoms of multiple sclerosis, complex regional pain syndromes, HIV-related peripheral neuropathy, neuropathic pain associated with cancer, and restless leg syndrome.

**12.** All but three of the 54 therapeutic uses listed in the "Therapeutic Uses" section are rated as "effective" or "possibly effective." Two of the three uses that are rated as "ineffective" (partial seizures—refractory and ALS) are presently being covered by AHCA.

The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R.Civ.P. 56(e)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material fact.*" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis added). The Court is not to resolve factual issues, but may only determine whether factual issues exist. A material fact is one which "might affect the outcome of the suit under the governing law ...." *Id.* Therefore, the appropriate inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 2511. The Court must view the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Maniccia v. Brown,* 171 F.3d 1364, 1367 (11th Cir.1999). If the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the Court must enter summary judgment for the moving party. *Celotex,* 106 S.Ct. at 2552.

■ Plaintiffs are asking this Court to enter a permanent injunction requiring Defendant to refrain from applying the July 1, 2004, Neurontin policy and instead, provide coverage for off-label uses of Neurontin which are cited in one of the congressionally-approved compendia listed in 42 U.S.C. § 1396r–8(g)(1)(B)(i), and take other steps that are reasonably necessary to ensure that notice of Defendant's change in policy is communicated to affected individuals. To obtain permanent injunctive relief, a party must show (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the Court does not order injunctive relief. *Alabama v. U.S. Army Corps. of Engineers,* 424 F.3d 1117, 1128 (11th Cir.2005) (because an injunction is an extraordinary remedy, "it is available not simply when the legal right asserted has been infringed, but only when that legal right has been infringed by an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue."). In evaluating requests for permanent injunctions, courts in this district also have balanced the competing claims of injury to the parties and considered the public interest. *See, e.g., Fla. Keys Citizens Coalition, Inc. v. U.S. Army Corps of Engineers,* 374 F.Supp.2d 1116, 1128 (S.D.Fla. 2005) (noting that the standard for issuance of a permanent injunction is very similar to the standard for issuance of a preliminary injunction).

### Discussion

■ Plaintiffs argue that Defendant's Neurontin policy violates the Medicaid Act's requirements for outpatient prescription drug coverage. Specifically, they claim that AHCA's refusal to cover off-label drugs cited in any of the drug compendia unless they are supported by double-blind, placebo-controlled, randomized clinical trials is inconsistent with Medicaid's drug coverage scheme; isolates the definition of a "medically accepted indication" for a covered drug from the remainder of the statutory scheme; and renders phrases in the statute mere surplusage.

It is Plaintiffs' position that Defendant has created his own arbitrary definition of

"medically accepted indication" by construing the phrase "supported by citation in a compendia" to mean that a use included in a compendium can only mean that it must also be supported by double-blind, placebo-controlled, randomized clinical studies. Plaintiffs argue this construction of the statute is erroneous, for several reasons. First, there is nothing in the Medicaid Act defining "medically accepted indication" exclusively as a use that is supported by double-blind, placebo-controlled, randomized clinical studies. Rather, the statute simply requires coverage of any use that is supported by citation in one of the congressionally-approved compendia. Second, Plaintiffs say, there is nothing in the statute requiring the compendia themselves to only rely on double-blind, placebo-controlled, randomized clinical studies before they decide to cite such a use. Third, Plaintiffs argue the statute does not give Defendant the discretion to ignore the compendia and undertake his own review of the medical literature to determine if a drug's use should be covered based on his decision that the use must be supported by double-blind, placebo-controlled, randomized clinical studies. Finally, they assert that Defendant's interpretation of the statute is illogical and inconsistent in that AHCA is covering two non-FDA approved uses of Neurontin (ALS and partial seizures—refractory) which are *not* supported by double-blind, placebo-controlled, randomized clinical studies, and are rated as "ineffective" for such uses in DRUGDEX.

Plaintiffs contend that their interpretation of the term "medically accepted indication" is the only reasonable one. They assert that the Medicaid Act directs a state Medicaid agency to determine if a prescription is for a "medically accepted indication" by examining the text of the congressionally-approved drug compendia (if not for an FDA-approved use). If the use is supported by a citation in any of the compendia, as the statute mandates, then the state must cover the prescription. This examination, Plaintiffs say, leaves no room for the exercise of discretion on the part of the state agency to determine its own criteria for defining whether and how a use is supported by citation. The statute as written eliminates such discretion and results in a single, nationally uniform list of medically accepted indications.

AHCA counters that it is statutorily empowered by the Medicaid Act to review the citations in the compendia and to establish its own criteria to assess whether a reported use for a drug is supported by citations and is, therefore, a "medically accepted indication" subject to reimbursement. AHCA argues that the phrase "the use of which is supported by one or more citations included or approved for inclusion in any of the compendia" refers *not* to citations merely mentioned in passing in the compendia, but to citations which are set forth in the compendia *and* which are supported by double-blind, placebo-controlled, randomized clinical studies. AHCA notes that this is the standard employed by the FDA and ensures the most unbiased result, that the result can be replicated, and demonstrates that the drug is safe and effective for the listed use.

AHCA claims that Plaintiffs erroneously equate the 54 reported therapeutic uses for Neurontin in DRUGDEX with the term "citations" in § 1396r–8(k)(6). It is AHCA's position that "citation" means something more than mere inclusion in the compendia; it means the authoritative sources that substantiate the listing of therapeutic uses in the various compendia, and that it is entitled to employ its own criteria for making such a determination. Thus, AHCA refuses to cover the off-label citations in DRUGDEX that do not meet the stated standard, because they do not

meet the criteria established by the state to mandate coverage.

### 1. *Merits of the Case*

To obtain the permanent injunction they seek, Plaintiffs first must demonstrate as a matter of law that Defendant is violating the federal Medicaid Act. For the reasons discussed below, the Court concludes that Plaintiffs are entitled to summary judgment. The Court finds that Plaintiffs' interpretation of the term "medically accepted indication" is reasonable, AHCA's is not, and, therefore, AHCA's determination that most of the off-label uses cited in DRUGDEX are not "medically accepted indications" because they are not substantiated by double-blind, placebo-controlled, randomized clinical trials is erroneous. Once this conclusion is reached, it is clear that Defendant's application of its Neurontin policy which stems from this erroneous interpretation violates federal law.

The Court finds that AHCA has misconstrued the term "medically accepted indication," and in so doing, is using the state's prior authorization program to deny reimbursement for a covered outpatient drug, something not permitted by the Medicaid Act. While AHCA may *condition* drug coverage for medically accepted indications upon certain prior authorization procedures being followed, *see* §§ 1396r–8(d)(1)(A), (d)(5), the agency may not *exclude* coverage, i.e., deny reimbursement, for a covered drug under these subsections pursuant to the type of prior authorization program established by the state. To do so clearly violates the federal act.

Although AHCA has every right, and indeed an obligation, to ensure that it is not covering drugs that are subject to clinical abuse or misuse, it must act within the confines of the Medicaid law. The state must follow the procedures for excluding Medicaid-eligible drugs like Neurontin that are set out § 1396r–8(d). Through a properly-constituted formulary committee, the state may establish a drug formulary and then, for clinical reasons, exclude Neurontin for certain off-label uses from the formulary. Alternatively, through its annual drug utilization review report, the state may advise the Secretary of HHS that Neurontin is subject to clinical abuse or inappropriate use. However, until the HHS Secretary amends the HHS regulation to add Neurontin or specified uses thereof to the list of excluded drugs, the state may not stop covering the drug for most uses based simply on its own determination that the drug is being abused or misused. Finally, the only other way the state can deny reimbursement for off-label uses of Neurontin is by concluding that the drug is being prescribed for non-"medically accepted indications," which is what AHCA has done. But for the reasons discussed below, the Court rejects this conclusion.

 Applying well-established rules of statutory construction, the Court finds that AHCA's construction of the statute is inconsistent with congressional intent as expressed through the Medicaid Act. The Court must "assume that Congress used the words in a statute as they are commonly and ordinarily understood, and we read the statute to give full effect to each of its provisions." *U.S. v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir.1999). A statute "ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *U.S. v. Ballinger,* 395 F.3d 1218, 1236 (11th Cir.2005) (citation omitted). The Court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* at 1237 (citation omitted). A statute should be interpreted "so that no words shall be discarded as being meaningless, redundant, or mere surplus-

age.... It is [the court's] duty to give effect, if possible to every clause and word of a statute rather than to emasculate an entire section...." *U.S. v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir.1991) (citation omitted). Moreover, "statutory language must be read in the context of the purpose it was intended to serve." *Ballinger*, 395 F.3d at 1237. "[N]othing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or absurd conclusion." *Id.* (citation omitted).

AHCA's construction of § 1396r–8(k)(6) renders superfluous the second phrase of the term "medically accepted indication." The statute provides for coverage of drugs that are prescribed for (1) FDA-approved uses or (2) off-label uses supported by citation in the compendia. AHCA reads the second phrase to mean only those uses that are supported by double-blind, placebo-controlled, randomized clinical trials. But this is the same standard employed for FDA-approved uses. Requiring off-label uses to be supported by the same standard as FDA-approved uses is the equivalent of saying the same thing twice. If Congress had intended that "medically accepted indications" must be supported by double-blind, placebo-controlled, randomized clinical trials, it would have said so. *See, e.g., CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir.2001) ("[w]here Congress knows how to say something but chooses not to, its silence is controlling.") (quoting *In re Griffith*, 206 F.3d 1389, 1394 (11th Cir.2000)). The Court cannot approve a statutory construction that reads a phrase out of the term "medically accepted indication."

■ It is another fundamental principle of statutory construction that Congress is presumed to know the meaning of existing law when it passes legislation. *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990). In 1993, Congress amended the definition of "medically accepted indication" to add the phrase which is at the heart of this case: "or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection (g)(1)(B)(i)." *See* Pub. L. No. 103–66, § 13602(a)(2)(B)(iii), 107 Stat. 312, 619 (1993). A few years later, in 1997, Congress updated subsection (g)(1)(B)(i) to add DRUGDEX to the approved list of compendia. *See* Pub. L. No. 105–33, § 4756, 111 Stat. 251, 527 (1997). Several years later, in 2003, Congress *again* updated the list of approved compendia by eliminating American Medical Association Drug Evaluations from subsection (g)(1)(B)(i). *See* Pub. L. No. 108–173, § 101(e)(9)(B), 117 Stat. 2066, 2152 (2003). The Court must presume that Congress knew what it was doing when it added "supported by citation in the compendia" to the term "medically accepted indication," and further, that it understood the differences in the compendia's organization, format, and editorial practices when it added DRUGDEX as an approved compendium. These statutory changes over the years substantiate the notion that Congress intended coverage for off-label uses, many of which would obviously not be supported by the same strict criteria required for FDA approval. Had Congress intended otherwise, it would have been easy to amend the term "medically accepted indication" to add the phrase "that meet the same testing criteria for approval required by the FDA," for any such off-label uses.

Commentary by the federal agency charged with implementing the Medicaid law lends support for Plaintiffs' argument that the Medicaid Act covers many off-label uses which are not supported by the same strict criteria required for FDA ap-

proval. After Congress added DRUG-DEX to the list of approved compendia, the head of HHS' Center for Medicaid and State Operations notified state Medicaid directors of the change by saying:

> The addition of DRUGDEX also means that some additional indications would be considered "medically accepted indications" for purposes of [§ 1396r–8(k)(6)]. This will not effect [sic] coverage rules for non-FDA approved drugs (i.e., drugs that are international or investigational), nor over-the-counter (OTC) drugs. It would, however, require coverage of additional off-label uses of FDA approved drugs for the indications that are listed in the DRUG-DEX monographs. As before, prior approval policies can be put in place, (e.g. to require another drug to be used first for that indication), but *prior authorization cannot be used to simply deny the off-label DRUGDEX-identified indication for a drug.*

*See* Plfs.' Second Not., Ex. 2 (Release No. 70) at 1 (emphasis supplied). AHCA has done just that in contravention of the Center's stated policy: employed the prior authorization program to deny coverage of certain drugs.

Significantly, AHCA has arbitrarily determined that a double-blind, placebo-controlled, randomized clinical trial is the standard it will apply, disregarding the fact that the Act directs coverage when a use is supported by citation in a compendia, a different standard. Under AHCA's interpretation, nothing would prevent a state Medicaid agency from deciding to apply an entirely different standard altogether. Counsel for AHCA acknowledged at the preliminary injunction hearing that a state could go behind what is listed in the compendia and make its own determination as to whether a particular use is sufficiently supported by clinical evidence. *See* Tr. of Sept. 21, 2005, Hr'g (D.E. No. 98) at 17–20. Thus, a state Medicaid agen-cy could choose any standard it wants, either more rigid, or less stringent, employing whatever reasoning it chooses as a justification to eliminate covered uses. Moreover, the state could change its criteria at any time. It could even disregard the compendia entirely in making its choices. Indeed, Jerry Wells, AHCA's Bureau Chief for the Pharmacy Services Bureau in Medicaid, testified that Florida could have used a different standard from the one it now uses, and he acknowledged that coverage of a particular drug for a particular use could vary from state to state. *See* Tr. of Sept. 22, 2005, Hr'g (D.E. No. 111) at 105. That means that fifty states could establish their own criteria for denying coverage of a Medicaid-eligible drug without going through the formulary process or employing the other methods delineated in the statute for excluding a drug. The Court finds that this approach contravenes provisions of the Medicaid Act and Congress' intent to establish uniformity in Medicaid drug coverage. It would contravene the statutory scheme which sets forth very specific criteria and means by which a state may exclude coverage for specific drugs or uses of such drugs.

To the extent that AHCA uses the compendia, and DRUGDEX in particular, AHCA is deciding on its own what is "supported by citation," as is evidenced by its decision to pay for two of the three uses which are listed as "ineffective" (i.e., partial seizures—refractory and ALS) and to not pay for others which are deemed "effective" (e.g., multiple sclerosis complications including, e.g., trigeminal neuralgia, which happens to be listed in AHFS). This renders the "supported by citation" provision in the statute irrelevant to AHCA's determination, and means that AHCA is disregarding the federal statute when it makes its own determination based on its own criteria, irrespective of the drug's citation in DRUGDEX.

Furthermore, AHCA has ignored the fact that AHFS, another congressionally-approved compendium, cites several off-label uses for Neurontin in addition to the two FDA-approved uses. The editors of AHFS do not indicate what level of clinical support exists for any of the uses cited in the compendium,[13] so AHCA would provide reimbursement only for the two FDA-approved uses listed in this compendium. But again, this reads the "supported by citation in any of the compendia" phrase out of the statute, and effectively negates AHFS as a source for any off-label uses, in clear violation of the statute.

In essence, AHCA is attacking the motives and methodology of the editors of all of the compendia. However, Congress has already stamped its imprimatur on these compendia by including them in § 1396r–8(g)(1)(B)(i). AHCA may not substitute its own judgment for that of Congress.

■■■ AHCA argues that as the state agency charged with administering Florida's Medicaid program, this Court should accord substantial deference to its interpretation of the federal and state Medicaid statutes it administers. Consistently, however, federal courts have held that interpretations of federal law by *state* agencies are not entitled to such deference. *See, e.g., Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir.1997) (state agency's interpretation of federal Medicaid Act not entitled to substantial deference); *Amisub*

*(PSL), Inc. v. Colo. Dep't of Soc. Servs.*, 879 F.2d 789, 795–96 (10th · Cir.1989) ("state agency's determination of procedural and substantive compliance with [the Medicaid Act] is not entitled to the deference afforded a federal agency."); *Turner v. Perales*, 869 F.2d 140, 141 (2d Cir.1989) (state agency interpretation of federal housing law not entitled to substantial deference). As these courts have noted, the holding in one of the cases Defendant cited, *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), that an implementing federal agency is entitled to deference so long as its interpretation of an ambiguous statute is reasonable, and not arbitrary, capricious or manifestly contrary to the organic statute, does not similarly apply to interpretations of federal law by *state* agencies.

> *Chevron*'s policy underpinnings emphasize the expertise and familiarity of the federal agency with the subject matter of its mandate and the need for coherent and uniform construction of federal law nationwide. Those considerations are not apt [to a state agency].

*Belshe*, 103 F.3d at 1495–96 (quoting *Turner*, 869 F.2d at 141). The question before this Court is "whether the state law and regulations are consistent with federal law." The standard of review of AHCA's interpretation of § 1396r–8(k)(6), then, is *de novo. Id.* at 1495; *Turner*, 869 F.2d at 141.[14]

---

13. According to Plaintiffs, AHFS does rely on randomized, double-blind and controlled studies for its listings. If this is so, and AHCA is disregarding off-label uses in AHFS which are supported by double-blind, placebo-controlled, randomized clinical trials, then AHCA's decision to support some, but not all uses supported by double-blind, placebo-controlled, randomized clinical trials, renders AHCA's coverage decisions not only inconsistent but totally arbitrary. However, there is insufficient support in the record to establish

whether such AHFS-cited uses are in fact so supported.

14. *Meadows* does not support AHCA's position that its interpretation of the Medicaid Act should be accorded substantial deference. The issue in *Meadows* was whether a conflict existed between a recently-enacted Florida law and the governing federal Medicaid statute. 304 F.3d at 1199. The question of how much deference to accord AHCA arose in the context of the agency's interpretation of the *Florida* law, not the federal law. "[T]he

It also bears note that AHCA, by excluding coverage pursuant to the prior authorization program, has gone beyond what the Florida Legislature authorized it to do. The Florida Legislature obviously recognized the limitations of the Medicaid Act in excluding drugs, and recognized the limitations of Florida's prior authorization program. The law passed in 2004 permitted AHCA, at its discretion, to require prior authorization for the off-label use of Medicaid-covered prescribed drugs such as Neurontin. *See* Fla. Stat. § 409.912(39)(a) 13, (2005). Nothing in the law authorized AHCA to *exclude* certain uses from coverage, which it has improperly done through implementation of its new Neurontin policy.

The Court finds that Plaintiffs' interpretation of "supported by citation in the compendia" is reasonable, harmonizes the two phrases in the term "medically accepted indication," and satisfies the intent of the Medicaid Act in establishing uniform criteria for drug coverage. Plaintiffs' interpretation results in a uniform list of medically accepted indications that all states providing outpatient prescription drug coverage must utilize.

Plaintiffs acknowledge it would be inappropriate to cover any drug listed for any use in any section of DRUGDEX, and argue instead that all the uses listed in the "Therapeutic Uses" section of DRUGDEX should be considered "medically accepted indications." They argue that since the "Place in Therapy" section mentions only one of the two FDA-approved uses for Neurontin (for seizures), reference to this section alone would render both clauses of § 1396r–8(k)(6) (FDA-approved uses and uses which are supported by citation) meaningless. Plaintiffs suggest that relying on the "References" section alone would be nonsensical since it includes citations to uses for Neurontin that are not even listed in the "Therapeutic Uses" section. And they discount reliance on the "Comparative Efficacy" section because it simply compares Neurontin to other drugs for several therapeutic uses.

Plaintiffs say, then, that the only possible construction of the statute vis-a-vis DRUGDEX is that the 54 off-label uses listed in the "Therapeutic Uses" section are "supported by citation" as defined in 42 U.S.C. § 1396r–8(k)(6). Plaintiffs acknowledge that the "Therapeutic Uses" section encompasses three uses that are rated as "ineffective," but they point out that Defendant already covers two of those uses (partial seizures refractory and ALS). No other construction of the statute leads to a consistent reasonable result.

Plaintiffs also point out that the Medicaid Act does not require a use listed in a compendium to be rated "effective." The statute reads that a use must be "supported by one or more citations included . . . in any of the compendia." It says nothing about a use having been evaluated in terms of efficacy by the compendia's editors. Plaintiffs argue that Defendant has "superimposed" an "effectiveness" criteria on the term "medically accepted indication;" doing so renders Congress's reference to the *other* compendia, which do *not* include classifications of effectiveness, meaningless.

AHCA claims that accepting Plaintiffs' assertions that the mere fact that a drug has been cited in the compendia for a particular off-label use constitutes a "non-

---

AHCA maintains that the Florida law actually creates a prior authorization program . . . . The AHCA has consistently advanced this interpretation since the enactment of the Florida law. As the state agency that administers the state Medicaid plan, and because its construction is reasonable, we believe that the AHCA's interpretation of the *Florida* law is entitled to substantial deference." *Id.* at 1208 (citations omitted; emphasis supplied).

rebuttable" finding that the off-label use reported is a medically approved indication for use of the drug, and that Medicaid is required to reimburse for such off-label use, would be a dereliction of AHCA's statutorily-imposed duties. This is not so. All AHCA need do is follow the statute, not attempt to establish its own *ad hoc* criteria for determining coverage, and not improperly use the prior authorization program to deny coverage. Then AHCA will have done its statutorily-imposed duty. The compendia citations do not create an irrebuttable presumption, because the state can always adopt a formulary or avail itself of the other methods for exclusion of a drug which have been adopted in the federal statutory scheme. Here, though, AHCA adopted its own *ad hoc* procedure for excluding Neurontin from coverage. By applying a more stringent test for drug coverage than the one set out by Congress, AHCA is effectively denying coverage for those drugs it is legally required to cover.

For the foregoing reasons, the Court concludes that Plaintiffs have met their burden under Rule 56 and are entitled to judgment as a matter of law.

## 2. *Adequate Remedy of Law*

In addition to prevailing on the merits of the case, a party seeking a permanent injunction must also demonstrate there is no adequate remedy at law for the violation of the right asserted in the complaint. *Alabama*, 424 F.3d at 1128. Plaintiffs in this case are not seeking monetary damages but rather, prospective injunctive relief. They are asking this Court to enjoin Defendant, as head of the state Medicaid agency, from continuing to implement a policy which they say (and which this Court has found) violates the federal Medicaid Act. They seek to force Defendant to adopt a written policy which complies with the Medicaid Act and ensures coverage of Neurontin for those uses recognized in the Medicaid law, and to take appropriate ac-

tion to ensure that affected individuals are notified of the change in policy and advised that previously-denied prescriptions for Neurontin can be re-submitted for reimbursement to AHCA. In such a case, the only relief available *is* injunctive relief. Plaintiffs have met their burden under this prong of the permanent injunction standard.

## 3. *Irreparable Harm*

To obtain the injunction, Plaintiffs also must show that irreparable harm will result if the Court does not order injunctive relief. *Id.* The Court must determine whether Plaintiffs will suffer irreparable harm if AHCA's Neurontin policy is permitted to remain in effect. Plaintiffs are low-income residents of Florida who cannot pay for their own health care. Their poverty qualifies them for participation in the Florida Medicaid program, which guarantees them prompt access to essential medical services. Plaintiffs' treating physicians have concluded, after assessing their patient's conditions and medical histories, including other drugs prescribed and reactions thereto, that Neurontin is medically necessary and indicated for the treatment of Plaintiffs' conditions. Plaintiffs claim that as a result of Defendant's refusal to cover Neurontin for their conditions (because they are not among the four that AHCA has approved for coverage), they and other Medicaid recipients like them are being denied essential medical treatment, and that the resultant harm is imminent and irreparable.

AHCA counters that Plaintiffs have failed to show they would suffer irreparable harm if they are no longer able to take Neurontin. It is AHCA's position that any harm is speculative and remote, because Neurontin has not been shown to have any curative effect on any of the indications for which AHCA is denying reimbursement,

and in any event, there are alternative drugs covered by AHCA that have been proven to be safe and effective in treating the conditions from which Plaintiffs suffer.

The Court has already concluded that AHCA's Neurontin policy violates the Medicaid Act, and that AHCA is improperly denying reimbursement for Neurontin for numerous medically accepted indications. Consequently, AHCA is denying Medicaid benefits to which Plaintiffs are legally entitled. The denial of medical benefits, and resultant loss of essential medical services, constitutes an irreparable harm to these individuals. *See, e.g., Cramer v. Chiles,* 33 F.Supp.2d 1342, 1349 (S.D.Fla.1999) (reduction in funding for one Medicaid program, with simultaneous elimination of another program, placed plaintiffs at imminent risk of irreparable harm); *Mitson v. Coler,* 670 F.Supp. 1568, 1577 (S.D.Fla.1987) (nursing home plaintiffs who sued to enjoin state agency from including as "countable income," for purposes of determining eligibility for Medicaid benefits, veteran's pension funds would suffer irreparable injury unless an injunction issued since many would otherwise be deprived of essential medical care); *Dodson v. Parham,* 427 F.Supp. 97, 108 (N.D.Ga.1977) (finding irreparable harm where state's proposed restriction of covered drugs might cut off Medicaid recipients from indicated prescription drugs overnight, over a weekend, or indefinitely pending review by the state's drug utilization review board); *Beltran v. Myers,* 677 F.2d 1317, 1322 (9th Cir.1982) (finding irreparable harm where enforcement of the state rule for determining eligibility for Medicaid benefits "may deny [plaintiffs] needed medical care"); *Newton–Nations v. Rogers,* 316 F.Supp.2d 883, 888 (D.Ariz. 2004) (finding irreparable harm where plaintiff Medicaid recipients could be denied medical care as a result of their inability to pay increased co-payment to medical service providers; citing *Beltran*);

*Doe v. Perales,* 782 F.Supp. 201, 204–205 (W.D.N.Y.1991) (concluding that reduction in Medicaid benefits for nursing home residents constituted irreparable harm to support preliminary injunction); *Benjamin H. v. Ohl,* No. 3:99–0338, 1999 U.S. Dist. LEXIS 22469, at *36–*37 (S.D.W.V. July 15, 1999) (irreparable harm established where plaintiffs were not receiving therapy, habilitation services, respite care, and other benefits to which they were entitled under Medicaid, and lack of services was causing some plaintiffs to lose skills previously acquired and was creating unnecessary stress on plaintiffs, families and care givers); *Mass. Ass'n of Older Americans v. Sharp,* 700 F.2d 749, 753 (1st Cir.1983) ("Termination of benefits that causes individuals to forgo such necessary medical care is clearly irreparable injury."). The Court concludes that Plaintiffs are suffering, and will continue to suffer, imminent and irreparable harm as a result of AHCA's continued implementation of its Neurontin policy and its continuing denial of Medicaid benefits to Plaintiffs.

### 4. *Balance of Hardships and Public Interest*

█ The Court finds, and Defendant has not claimed otherwise, that the harm to Plaintiffs of being deprived of essential medical services outweighs any harm to the state, and further, that the public interest would be advanced by AHCA's compliance with the outpatient prescription drug coverage requirements of the Medicaid Act. *See, e.g., Mitson,* 670 F.Supp. at 1577 ("the public interest will not only *not* be harmed by the issuance of this injunction, but will be substantially benefitted in that seriously ill, aged veterans will receive essential medical care that could not otherwise be provided") (emphasis in original). Issuance of an injunction to enforce the federal Medicaid Act is without question in the public interest, and the Court finds

that Plaintiffs have satisfied all prongs of the injunction standard.

### Conclusion

The Court finds that Plaintiffs are entitled to judgment as a matter of law in this case. The Court further finds that a permanent injunction as discussed herein is appropriate because Defendant is violating the federal Medicaid Act through implementation of its Neurontin policy, Plaintiffs do not have an adequate legal remedy and they are suffering and will continue to suffer irreparable harm if the policy remains in effect, the threat of injury to Plaintiffs outweighs any harm to Defendant, and the issuance of the permanent injunction is in the public interest.

It is hereby

**ORDERED AND ADJUDGED** that

1) **Plaintiffs' Motion for Summary Judgment (D.E. No. 92) is GRANTED.**

2) **The Court enters the following PERMANENT INJUNCTION:**

Defendant Alan Levine, acting in his official capacity as Secretary of the Florida Agency for Health Care Administration, shall

(a) refrain from continuing to implement the policy announced in "Medicaid Changes Effective July 1st, 2004, Neurontin Label Indications and Dosing;"

(b) adopt a written policy that ensures that a prescription for the covered outpatient drug Neurontin/Gabapentin will be reimbursed by Defendant if the drug use is cited in either the drug labeling or in at least one of the drug compendia cited at 42 U.S.C. § 1396r–8(g)(1)(B)(i);

(c) publish notice to all physicians and pharmacists that their patients can resub-

mit a prescription for Neurontin/Gabapentin, along with an amended prior authorization form; and

(d) provide written notice to members of the class whose prescriptions were denied since July 2004 that they can submit new prescriptions and prior authorization requests.

3) **Plaintiffs' Amended Motion for Preliminary Injunction (D.E. No. 11) is DENIED as moot.**

4) **Defendant's Corrected Motion for Judicial Notice (D.E. No. 73) is GRANTED in part and DENIED in part.**[15]

5) **Defendant's Motion for Judicial Notice (D.E. No. 70), which is duplicative of D.E. No. 73, is DENIED as moot.**

6) **All other pending motions in this case are DENIED as moot.**

---

**15.** As explained at the September 21–23, 2005, hearing, the Court granted this motion to the extent that Defendant was not required to prove the authenticity of the order from the district court in Massachusetts. The Court declined to take judicial notice of the *facts* contained in that order, which concerned a criminal plea agreement, with allegations admitted as true and found to be true by the district court.